Next case for argument is 2011-1360 YORKEY v. DIAB. Mr. Rogers, whenever you're ready. Good morning. The board's decision that YORKEY did not prove actual reduction to practice is based on legal error and not supported by substantial evidence. I'd like to start with the August 11, 1993 report. The board found that ADA did not work for its intended purpose, the ADA methodology of account, did not work for its intended purpose, relying on a single sentence in that August 11th report, which was two months after the reduction of practice. And that sentence said, quote, we have been unable to consistently calculate saturation accurately and automatically. And the board concluded, quote, lack of consistency suggests inoperability and unworkability. But the board's conclusion isn't supported by substantial evidence. There's nothing in that report that says, that sentence doesn't say that the reduction of practice was, in fact, unworkable or was, in fact, inoperable. It just doesn't say it. And the testimony from the inventor YORKEY was that this sentence didn't detract from the results that they had achieved two months earlier. And in fact, that sentence is flat out contradicted by the preceding sentence, which says, quote, for some simple motions and even for a motion breathed down, we could compensate for the accurate saturation calculations. And this is a reference back to the May and June tests from two months previous to this August report. And that not only corroborates those tests were successful and accurate, it improves reduction of practice. It also demonstrates... But the board here was focusing on the consistently part of it. The preceding sentence refers to under these circumstances, we can get very accurate saturation calculations. However, so, I mean, you're right that you have to read both sentences, but it seems to me that the however sentence, which the board ultimately focused on, carries a lot of weight. And they say not just lack of consistency suggests inoperability and unworkability, but they say to obtain consistently accurate results is not a small matter that can be characterized as a non-commercial version of an operable invention. How under the standard of review, which you recognize, are we supposed to reject that analysis? Because there's nothing in the count. The reduction of practice needs only to achieve the level of utility required by the count. The count doesn't say this is a system for the presence of motion. The count is much simpler than that and broader. It's simply to determine saturation in the presence of motion. And consistently and automatically is a commercial concept. It's an acceptability concept to put out perhaps in a hospital. It doesn't change the fact. Well, I appreciate what you're saying, but how are we supposed to sit here on appeal reviewing the board's decision? I mean, what amount of accuracy do you believe is required for the count? How do we know that? And how do we know that the board lacks substantial evidence for whatever amount of accuracy it was applied? I'm having difficulty on how analytically we come to a conclusion here. The first point is that the count doesn't require dead-on accuracy because the count is based on assumptions. That's how the invention works. You make some assumptions. Okay, so what's less than dead-on accuracy? What's less than dead-on accuracy is what the inventors identified as was successful for their intended purpose. When Ada reported a result of 92 percent, when the gold standard of the day, which was the N200 oximeter, was at 77 percent, they wrote Ada wins. And they said this demonstrated how successful we were and that we had reduced this invention to practice. In your brief, appropriately at page 27, you say the 27 instances of Ada wins are not the only laudatory comments appearing in the charts about Yorkie's Ada methodology, and then you list other examples. We said that, yeah, the three instances, and there were just... Where was that evidence presented to the board? Where's that in the record? Well, all of the evidence was in front of the board, that Ada wins was appearing on... All these charts were in front of the board. All of the board, all the evidence of the Ada wins, all that evidence itself was in front of the board. No, no, cite me to the Ada is better, Ada looks best, Ada accurate, column low, in the record. You're on page 27? I am in your brief. Opening... In 27 of the... Oh, the 27 are not only the comments appearing, other examples include Ada is better, Ada, and we identified where those are in our sites. Where were those cited to the board? These, I don't, other than, I don't believe that we particularly identified in our briefs these particular pages to the board. The evidence was in front of the board, and we relied upon the three specific instances which we've identified in the brief, and that was in our briefs before the board. We focused on three instances of Ada wins. Was this argument made before the board? Yes, about the three instances of Ada wins, absolutely. Well, that's not what I was asking you about. Right. That's not what I was asking you about. I was asking you about Ada looks best, Ada is better. Right, these examples which appear in the evidence, I do not believe we specifically mentioned those examples in the briefs. What we said in the briefs was that we focus on the three specific examples of Ada wins. That's what I was trying to say. But going back to the sentence, the consistency sentence, when the board dismissed, simply dismissed the previous sentence of accuracy, and the board did that and it committed legal error, because the board dismissed that previous sentence of we got very accurate results from the brief downs by saying that the count was not limited to the case of simple motions and brief downs. But the point is, those brief downs, the brief down test, and the evidence before the board was, involved scratching, squeezing, shaking, mechanically induced motions. What other motions could there possibly be, frankly, in coming up with some test for an invention that's supposed to be for patients? These data came from real patients, real people, and were presented to the methodology. When the court dismissed that previous, didn't even consider it, when the board dismissed that previous sentence because the count is not limited to simple motions and brief downs, the fact is the count covers those motions, and I can't conceive of what you would have to do in order to have, you can't present every conceivable motion that a patient might do when you're presenting evidence of reduction of practice. The inventors presented to their methodology motions that were representative of what they would expect in a real environment, and they were from a real environment. But you're not taking, the statement is accurate, right? The statement is accurate. You said that the count is not limited to the case of simple motions and brief downs. It's not an inaccurate statement, is it? No, as a statement, it's not. It covers motions, but what the board seems to be requiring is that the inventors have come up with every conceivable type of motion you could ever possibly imagine to throw at their software, but that's not what reduction to practice requires. Reduction to practice requires that you implement the count, and you be aware that it works, and you appreciate that it works, and that's what happened here. In the May and June tests, these inventors, Mr. Yorkey, the inventor, used hospital data, used brief down data with all these different types of motions, and he had eta wins, and we discussed three specific eta wins instances to the board, including how much better it was for eta than the N200, and that's the point. That's the reduction to practice, and when the board dismissed that sentence, it committed legal error. And the board also set the bar too high again because it was trying to establish, it was looking at this from a commercial acceptability standpoint, frankly. There may still have been work to do, but the case is clear. I want to get in another question about your evidence before your time's up. Sure. In your brief, you complain about the board's foundational ruling on the N200 chart and the Coleman. The board found that Yorkey felt it established an adequate foundation for those. Correct. But Yorkey testifies, found in the joint appendix at 4482, Clark Baker, under my direction, and I wrote the code in Exhibits 2038 and 2049, except I don't remember, he says, if I wrote any of the code directed to N200 or Oxman. And he says, I'm knowledgeable about the code in 2038 and 2049, and it was archived in Regular Course Business and so on. Point to me to evidence that establishes the foundation for Coleman and N200. Okay. So first of all, Your Honor, we're focusing only on the N200. We didn't focus on Coleman in our briefs. We're not relying upon the Coleman charts in our briefs as evidence of anything on appeal, or even down below. It was the N200, which was the gold standard. So let me point you to the evidence for the N200. Yorkey said, I didn't remember, I didn't remember if I wrote any of the code for the N200 software and believe someone else at NELCOR did. But Baker testified, I think it was in A6559 paragraph 12 of Baker. He said that he and Yorkey wrote the code. He also said, I generated the charts. He also, that's in 6562 paragraph 21. He also testified that the code corresponds to what was used to generate the charts. That's in A6562 paragraph 22. And here's the key, I think, to this, which is he was quote unquote knowledgeable. Baker was knowledgeable about the code at A6559 paragraph 12. What the board seems to be saying here is if you didn't write the code, you can't prove up its foundation. There's no law of which I'm aware which says that you have to write the code that you're relying upon for reduction of practice. Baker generated those charts. He used the code to do it. He was knowledgeable about the code. And he goes on. He says, I compiled the code. I validated the data that was commercially available. I manually reviewed the output charts. I reviewed the software for bugs. It's all the same part of the record. This is solid foundation for what those charts showed. And then the board went one further step. The board dismissed the foundation of those charts by saying, quote, Baker does not explain how the charts labeled as N200 were generated. In fact, he did. There's absolutely no substantial evidence for that statement by the board. What Baker did was he testified, and this appears at A6562 paragraph 21, and I think this bears a couple of seconds on it, quote, As part of our analysis, I generated a series of charts illustrating the oxygen saturation values computed by, dot, dot, dot, B, the pulse oximeter that had been used to collect the data, e.g., the NELCOR N200. What he testified to right there was it was the N200 itself that computed the saturation values. And all that happened in that software was it plotted the results produced by the N200. It's that simple. Let me take you to another point here as you're running out of time, and this is on the question of whether the ETA methodology worked or not. And the board found that a report written by Yorkie, and this report was dated two months after the reduction into practice, and their report says that he was still unable to obtain consistently accurate results and that Yorkie stated in the report herself, We've been unable to consistently calculate saturation accurately and automatically. We're looking at those particular findings under the substantial evidence rule, and I'd like for you to address that report. Okay, so this is the report that I had just spoken about at the beginning, and the reason why there's not support for substantial evidence was because Yorkie testified that that sentence doesn't mean that he didn't achieve the results he was hoping to achieve two months earlier. The previous sentence says the results were accurate, and whatever accuracy may mean, Judge Prose, 92%, 95%, to the inventors, it was accurate. And that's all we need to see. So the reason there's no substantial evidence for that is because the board looked at that sentence and pushed aside the preceding sentence and didn't focus on it as a consequence. And substantial evidence doesn't mean you find a snippet in the record to support your position. The substantial evidence test is, would a reasonable juror, a reasonable mind, considering all of the evidence, could they have reached that decision? And our position is when you look at all of the evidence, you could not. The substantial evidence does not support that position. Can I take you back to the foundation question? I know I apologize because we're bouncing you around, but I don't think that the other side necessarily takes issue with this, but it seems to me if the judge is analyzing whether or not there's an adequate foundation for testimony, that's an evidentiary question that we would typically review for an abuse of discretion. Am I wrong about that? No, I think that it's a finding that the court made that the evidence… You answered yes. Yes, I disagree. I think it's a substantial evidence question. Because? Because the board made a finding that the evidence submitted was insufficient, the testimony, to support the other evidence, the documentary evidence that he was looking at. But has the ruling itself a lack of foundation? That's a procedural ruling. If it's a procedural ruling, then I would say he abused his discretion because the evidence is contrary, completely contrary to what the board found. We had Mr. Baker say, I know this code. I know the code. I generated those charts. He didn't have to write it. And so there is no support for the board's position regarding foundation. Okay, thank you. You've exhausted, more than exhausted your rebuttal time. We'll restore two minutes, and then if Mr. Ray needs it, we'll give him an additional two minutes. Thank you, Your Honor. Good morning. May it please the Court. The standard of review is problematic for your view on this appeal. And it is a substantial evidence standard, and there is substantial evidence in support of the findings, particularly when you look at the arguments that were made below, and many of the arguments made here to this Court were not made below. And particularly the entire reply brief seems to focus on count construction, as if the board made an error of count construction with regard to what is the intended purpose of the invention at issue. Mr. Ray, let me ask a question that was asked to your opposing counsel, and that is, in effect, the board says a promising circumstance is not the same as having arrived at success. What is required to prove success? In this case, as in any other case where you're trying to prove an actual reduction of practice, you must show it works for the intended purpose. Works for the intended purpose. And the intended purpose, as found, as agreed to by the parties below, this is very important, the parties agreed that the intended purpose was to ascertain accurate saturation values in the presence of motion. Accurate saturation values. But are you saying that's 100% accuracy? No, nobody suggested 100% accuracy, right? Nobody suggested any definition for accuracy below. Accuracy for the intended purpose. Now, if you're talking count construction, it was incumbent on Yorkie, in the count construction phase, to have argued for a range of accuracy, but he never did. Never was there any briefing by Yorkie as to the meaning of accurate. So what is your view of what standard, what definition did the board apply to accurate and consistent? What definition were they using? Well, at that point, now you're talking a question of fact. Now the board is looking at all the evidence to see if the inventors appreciate it, it would work for its intended purpose, and it's clear that the inventors did not think it worked for its intended purpose, and these documents, these reports that we've been discussing, were written by the inventors after the alleged reduction of practicality. There is testimony, though, that the inventor testified that in his view, for purposes of the invention, that the results were accurate. No, what they did is they pointed to three patients out of dozens of patients of three points in single instances of time where they thought it was close. Now, that's not accurate. The point is, in this environment where testing is required, and it's a question of fact how much testing, you must have sufficient data in which to believe that it works for its intended purpose. Now, obviously they did not have sufficient data to determine it worked for its intended purpose. More importantly, the board never got to the point, Judge Rainier, that you were saying about did they show accuracy, because the comparative values that they were trying to use, they only had a few of them, from the N200 software, they never laid the foundation. So since they never laid the foundation, they never got to the point on whether or not they could show it was accurate, let alone accurate enough, let alone better. But better isn't what the count says. It requires measuring saturation values. And what's unfortunate is that the board didn't do a detailed count construction in its opinion because it wasn't in debate below. The parties were in agreement that the count required accurate saturation values. At that point, now you're in a question of fact land, and that is, okay, what's the evidence that the inventors thought it was accurate? And the evidence is, it was not accurate. They were not happy with it, and that's why it took two more years before they even filed for their patent application. They did not file until June 1995, and they're saying they had an actual reduction of practice in June of 1993. And so they had the burden of showing that they had an actual reduction of practice for the intended purpose. The inventors appreciated that it worked for its intended purpose, and they couldn't show that. Now, the board now made findings that this court, of course, under the standard review, is there substantial evidence. And we have, not only do we have the August 11th report, which was discussed with Mr. Rogers, we also have the August 31st report that also said that it was incapable of working under certain conditions. And the board, of course, can't dismiss an August 31st report that says it doesn't work under certain conditions. Now they have an August 11th report, and the main argument they made below was, well, the values are pretty stable. And the board said, well, stable doesn't mean it's accurate, because you could be stably at zero. We all know that's wrong. But you say it's very stable. Well, zero would mean no breathing at all. So stability doesn't imply accuracy. And that was their main argument below. So we have an August 11th report. We have an August 31st report. Well, the August 11th report says they get accurate results. The problem was the consistency of the accurate results. Correct. So it's not a matter of – they did get accurate results sometimes. I mean, there's no dispute about that. The question is whether or not they were consistently accurate. Correct, and that's the key, because you can always get an accurate result. You can get an accurate result randomly. I mean, even a broken clock is right twice a day. But that's not – we don't say you have a functional clock. When you have hundreds and thousands of data points, and you're only selecting from among 25 to 30 values, 70 to 100, you're going to get accurate values randomly. So if you have chances of getting random values, and they only selected three before the board, you're right, Judge Wallach, that 27 instances, that was never presented to the board. They relied on three instances, three specific dots. And they said that proves accuracy? Of course not. It doesn't prove accuracy. Where do we – I'm sorry. Go ahead. Where do we look to in the record to establish – to find out what the count – I mean, the board says the count is not limited to the case of simple motions and breathe-downs, which is what that first sentence in the April 11th – Right. Where do we look to to determine that? I mean, is there some place where the count says that includes other motions? The count just says motion. Motion. So how do we know that motion, if we were coming out of outer space, how do we know that motion is not limited to simple motions and breathe-downs? You wouldn't because it wasn't litigated below. Again, they didn't seek a construction of motion. They could have sought a construction – Well, the board must have thought – I mean, the board assumed that these two, simple motions and breathe-downs, they were more motions. Sure. I mean – Why is the board correct? On what did it base assumptions? Well, common sense. You know there's more motions than just shivering and shaking. I mean, tapping. Tapping is another form of motion. Picking your nose can be a form of motion. It's whenever you have the sensor and your body is moving. It's human behavior. Human behavior is limitless. I mean, I don't think there was any debate about that. And all he's saying is getting a value accurately in a controlled environment setting doesn't indicate that you thought it would work in the real world in a real setting. And so he's right. It's not like infringement or anticipation where if it occurs once you have an anticipation or an infringement. You have to show that it would work for its intended purpose. That was the third burden below, and the board said based on all this evidence, obviously they didn't show that. And getting one or two points that you think are pretty close is not showing you thought it would work for its intended purpose, and hence they took two more years before they filed their patent application on this device. I also want to respond to some of the arguments about the N200 and this comparison. They're now doing a comparison. But if you don't lay a foundation for the values against which you're comparing, how does that help? And they didn't lay a foundation that the N200 software was, first of all, what is that? And why are you comparing it to the N200? Now I heard Mr. Rogers call it the gold standard, but it was the gold standard but it wasn't adapted to motion. The N200 wasn't a motion device. The motion devices against which this claimed invention should have been compared to are set forth in the background of the invention and the patent application. And the patent application talks about other devices which limit the effects of motion as prior art. But nobody, no one ever established that the N200 had any capability whatsoever in reading through motion. So comparing values to a device for which you laid no foundation, which is not even meant to read through motion, is not establishing any standard at all. The other thing is, even if they had established a foundation for the N200, the N200 showed values that did not match the ADA values. So, for example, one of the three instances, they got a value of 92, but the so-called true value, according to the record, was 100. Well, is 92 accurate when the real value is 100? Well, our expert in the declaration said 92. No one would consider 92 accurate when the true value is 100. That's substantial evidence right there. So there's lots of evidence. Any amount of this evidence would be substantial evidence to explain why they took two more years to file for their patent application. And there's substantial evidence by the two reports and the rejection of the stability argument and the lack of foundation on the N200. And so even if they established a prima facie case, which is all this court held in the prior, where they have to assume the allegations is true, now we have the judge below as a fact finder, and those facts should be deferred to under the standard of review. The only time, I want to go back to this relative accuracy. It's clear. Let me ask you a question before you go on. Let's go back to York v. 1. What realness does that case have on this? Doesn't York v. 1 establish a presumption in favor of York v. 1's claim of reduction to practice? No. All York v. 1 established was that York v. 1 established a prima facie case, and the board below took that as a given. The board followed York v. 1 and said, okay, we will treat you as having established a prima facie case. Well, that's treating everything as true and treating their allegations as established for a prima facie case. Now the board gets to look at the Diab's response and the York v. 1 reply, which they couldn't do before. And you'll notice in the board opinion he makes that very clear. He says, now I'm going to look at the Diab's response and the reply, and now he's going to make findings of fact. See, so for example, Mr. Rogers relied upon that one statement about the N200, but now the board gets to look at all the other evidence that's contrary to that statement. See, now the board is making findings of fact on remand, which they couldn't do before. Before we were on a de novo, assume everything's true standard of review. Now we're up on substantial evidence because now the board is acting as a trier of fact, which was not the case before with regard to that count from York v. 1. So York v. 1, they overuse York v. 1 to act as if there's an irrebuttable presumption. No. Prima facie case is established. Is there any language in York v. 1 that says that the invention was worked for its intended purpose, or is it just dicta? Well, there was one clause that said that that was clearly—well, I don't even want to call it dicta. It wasn't before the court. The actual reduction of practice was not before the court. It wasn't at issue. Unfortunately, footnote 5 makes it sound like it wasn't contested, but that really wasn't the case. It wasn't at issue. And no one's disputing that. Nobody's disputing that. But also, just in fairness to their side, I don't think they're asking for—at the extreme, they're not asking for an irrebuttable presumption. They were asking for a rebuttable presumption. That's correct, but the burden is theirs. That's the problem with that. The presumption is—I don't know if that applies, because the burden is still theirs to prove actual reduction of practice, regardless of York v. 1. The burden didn't shift to us somehow. The burden is on them in light of all the evidence to prove the actual reduction of practice, and they didn't do that. All York v. 1 says is they alleged it, and we have to treat the allegations as true. Okay, fine. Now let's make findings of fact. Let's go and evaluate the evidence and see what the facts really are. And that's in light of all the records where you don't have to treat statements as true on remands. So, big difference, and the procedural setting in the standard review is absolutely critical to realize that York v. 1 does it fine. So, to sum, the count construction was not litigated below. It requires accuracy. Not for the first time in the Rule 28J letter, and this is the first time you'll see this, Mr. Rogers submitted a 28J letter to this court on December 15th, and for the very first time you see the statement, the count's intended purpose here is to produce approximately accurate saturation values. Never argued below, because Mr. Rogers knows on the substantial evidence test his case is bad. It's a loser on the substantial evidence, so now this is an attempt in the reply in particular, and now for the first time, approximately accurate, is being argued as a legal matter to redefine what is the invention at issue. The word was accurate below, and if you even look at the reply brief at A601 before the board, A601, they even tried to meet the accurate standard. They even say, i.e., accurate, and that's what we litigated below, and it was incumbent on them to submit some sort of declaration or evidence as to what people in the field think accurate is, how accurate is accurate. Nobody attempted to do that below. They could have, but didn't. They were satisfied with the construction of the count that we advocated, that the board assumed, and they agreed to. So that de novo review that they discussed at length in the reply brief is de novo review, and there's nothing to review because it wasn't at issue below on the construction of the count. And so it was incumbent upon them to have evidence of accuracy. They clearly didn't. There's lots of evidence to suggest inaccuracy and dissatisfaction with the invention, particularly the two reports and the Ada-incapable problem, which is another problem with the August 31st report at 6216 where the inventors recognized it doesn't work at low saturation times. So with the standard review, this is a perfect board opinion. There's not a single sentence in that opinion that is incorrect. It is fully supported by the evidence, and for that reason this court should defer. Thank you, Judge Gross. I want to focus on the statement Mr. Wray said, that the parties agreed that they claimed the count interference was intended to ascertain accurate results. We never agreed to that at all. In fact, that was plainly disputed, and that's appearing on page 7 of our reply brief because they said this in their opposition brief. We pointed out that in response to Dieb's material fact number 138, this is our reply brief, Yorkie brief, page 7, which is quoted, the material fact proposed by Dieb was, quote, the intended purpose of the count is to accurately determine an oxygen saturation value in the presence of motion. We disputed that. We said, no, that's not right, stating that the count refers to a method for measuring saturation. This has always been at issue. Was the word claim construction raised in front of the board? No. We were arguing what accuracy meant. We argued that accuracy meant 92 percent when the control value was 97 percent. We said- Yeah, but you go on, on the page that you point to in gray, you say, I mean, Yorkie does not disagree that measuring saturation implies a degree of accuracy. A degree of accuracy. The fight below- So it's, is your argument a hundred, it doesn't require a hundred percent accuracy. Correct, and Dieb seems to be saying that. Dieb was telling the board, it's not accurate, it's not accurate, and we were saying, of course it's accurate. 92 percent is accurate, and we said that to the board. So to say that we agreed that the count requires accuracy is just not right. The issue is, what does accuracy mean? And when you have approximations, and the patent talks about all that and assumptions, it can't be dead on. The other point I wanted to make was that this issue about stability does not imply accuracy. It actually does, and this is also in our brief. We pointed out this sentence, and Dieb pointed out this sentence, too, to the board below. Quote, motion can cause a false peak resulting in a measurement having an inaccurate value. That's in the patent, 83657, column 1, line 53 to 55. They relied upon that sentence below. This was plainly in front of the board. And the false peaks are instabilities in the signal. So stability of the signal absolutely relates to accuracy, and we demonstrated evidence of that to the board. We pointed out to the board... Do you want to wrap it up? Yes. And we pointed this out on page... that the N200 had wild swings in the signal, and that was inaccurate compared to Ada. Thank you. We thank both current publications.